IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| GLORIA A. CRITTENDON,<br>    *Pro se* Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:13cv534 (REP) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
|     Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Gloria A. Crittendon ("Plaintiff"), proceeding *pro se*, is 50 years old and previously worked as a housekeeper and laundry worker. In July 2010, Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability beginning July 1, 2009, due to an affective disorder and a substance abuse disorder. Plaintiff's claim, while represented by counsel, was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits. The Appeals Council subsequently denied Plaintiff's request for review on January 11, 2013.

Plaintiff challenges the ALJ's denial of benefits on the basis that the ALJ incorrectly determined that Plaintiff could perform work at all exertional levels with non-exertional limitations and that the ALJ erred in affording less than controlling weight to Plaintiff's treating medical sources' opinions. (Pl.'s Resp. to Scheduling Order ("Pl.'s Mem.") (ECF No. 13) at 1; Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Reply") (ECF No. 16) at 1-2.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The matter is before the Court for a report and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) on cross-motions for summary judgment.[1]  For the reasons set forth below, the

Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13)[2] be DENIED;

that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED; and that the final

decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges whether the ALJ erred in determining that Plaintiff had the

ability to perform work at all exertional levels with nonexertional limitations and in affording

less than controlling weight to Plaintiff's treating sources' opinions, Plaintiff's education and

work histories, Plaintiff's relevant medical history, non-treating state agency psychologists'

opinions, Plaintiff's function report, third-party reports and Plaintiff's hearing testimony are

summarized below.

A.     Plaintiff's Education and Work Histories

Plaintiff is 50 years old.  (R. at 159.)  She completed high school and attended special

education classes.  (R. at 196.)  Plaintiff previously worked as a pizza maker, housekeeper,

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

[2]     Plaintiff's motion is styled "Response Scheduling Order in a Social Security Appeal."  Although not filed as a Motion for Summary Judgment, Plaintiff asks the Court to review the ALJ's decision that Plaintiff was not entitled to benefits. (Pl.'s Mem. at 1.)  Because "[a] document filed *pro se* is 'to be liberally construed,'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)), the Court will treat Plaintiff's "Response Scheduling Order in a Social Security Appeal" as a motion for summary judgment.

cashier and assembly line worker. (R. at 196.) Most recently, Plaintiff worked as a machine operator at a laundry company. (R. at 196.)

  B. Medical Records

    1. Physical Treatment

  On August 26, 2009, Plaintiff sought treatment from Cheryl M. Belle, M.D. (R. at 304.) Dr. Belle noted that Plaintiff was diagnosed with hypertension while incarcerated. (R. at 304.) Dr. Belle prescribed Lisinopril for Plaintiff. (R. at 304.) Plaintiff returned to Dr. Belle on September 26, 2009, complaining of high blood pressure. (R. at 294.) During this appointment, Plaintiff admitted to marijuana use. (R. at 296.) Plaintiff failed to attend her March 2010 appointments. (R. at 309-10.) On April 9, 2010, Dr. Belle refilled Plaintiff's prescription. (R. at 308.)

  During Plaintiff's June 8, 2010 appointment, Dr. Belle noted Plaintiff's noncompliance with her medication regime. (R. at 306.) Specifically, Plaintiff failed to take her medication during the previous days. (R. at 306.) On September 30, 2010, Plaintiff's blood pressure registered at 162/112 and Dr. Belle indicated that Plaintiff's hypertension was "uncontrolled." (R. at 302.) Plaintiff did not attend her October 28, 2010 appointment. (R. at 299.) During Plaintiff's November 11, 2010 appointment, Dr. Belle noted that Plaintiff tolerated her medications and ordered Plaintiff to continue the same regime. (R. at 297.) Plaintiff's blood pressure measured at 120/88. (R. at 297.)

  On February 28, 2011, Plaintiff returned to Dr. Belle and reported stress. (R. at 364.) Dr. Belle noted that Plaintiff had been incarcerated since her last visit and Dr. Belle described Plaintiff's hypertension as uncontrolled. (R. at 364.) Plaintiff failed to comply with her

3

medication regime and Dr. Belle ordered Plaintiff to restart her medications. (R. at 364.) During

Plaintiff's May 26, 2011 appointment, Plaintiff's blood pressure measured at 118/82 and Plaintiff

had no complaints of chest pain, edema or shortness of breath. (R. at 360.) Dr. Belle noted that

Plaintiff was compliant in taking her medication. (R. at 360.)

During Plaintiff's September 15, 2011 appointment, Dr. Belle noted that Plaintiff

attended Alcoholics Anonymous meetings. (R. at 414.) On November 17, 2011, Dr. Belle

characterized Plaintiff's hypertension as uncontrolled, but noted that it was "usually controlled."

(R. at 415.)

### 2. Psychological Treatment

On January 27, 2010, Plaintiff underwent counseling from Ruby B. Cook, L.P.C. in

which Plaintiff demonstrated a normal, appropriate mood and participated actively in therapy.

(R. at 270.) Plaintiff reported normal sleep patterns with medication and responded to treatment

"as expected." (R. at 270.) Plaintiff took medication for depression and sleep and discussed her

anger problems. (R. at 269.) Ms. Cook described Plaintiff as kind, friendly, caring, loving and

supportive. (R. at 269.) During Plaintiff's February 16, 2010 counseling session, Plaintiff's

mood and mental status were normal, but Plaintiff reported that she experienced difficulty

sleeping. (R. at 267-68.) Though Plaintiff participated eagerly and actively throughout the

session, Plaintiff did not want to talk about her past abusive relationships. (R. at 267-68.)

On March 5, 2010, Ms. Cook reported that Plaintiff only partially complied with her

treatment and failed to complete her counseling homework. (R. at 265-66.) Plaintiff

demonstrated a normal mood and affect. (R. at 266.) Ms. Cook indicated that Plaintiff had a

verbal argument after drinking alcohol and noted that alcohol changed Plaintiff's personality.

4

(R. at 265.) During Plaintiff's March 17, 2010 session, Plaintiff admitted to drinking half a quart of alcohol about every three or four days. (R. at 263.) Ms. Cook discussed anger management with Plaintiff, but noted that Plaintiff's mood, affect and risk of violence appeared normal. (R. at 263-64.)

On April 27, 2010, Plaintiff reported utilizing Christian counseling and stated that she had not engaged in a physical fight in about two months. (R. at 261.) Plaintiff responded well to interventions and indicated that she did not stay angry for long periods of time. (R. at 261.) On May 11, 2010, Plaintiff reported feeling "blessed and good" about herself. (R. at 259.) Ms. Cook noted that Plaintiff was fully compliant with her treatment. (R. at 260.) On June 11, 2010, Ms. Cook discharged Plaintiff from her care, because Ms. Cook regarded further treatment as ineffective. (R. at 258.) Ms. Cook opined that Plaintiff lacked interest in counseling and noted that Plaintiff had cancelled or failed to attend most of her appointments. (R. at 258.)

On January 25, 2010, Plaintiff sought treatment from Sultan Lakhani, M.D. (R. at 272.) Plaintiff complained of mood swings and Dr. Lakhani noted that Plaintiff appeared depressed and anxious. (R. at 272, 274.) However, Plaintiff remained cooperative during the appointment and demonstrated normal speech and eye contact. (R. at 274.) Plaintiff's insight and judgment were poor. (R. at 274.) Dr. Lakhani prescribed Zoloft for Plaintiff and recommended that Plaintiff refrain completely from alcohol. (R. at 274.) Plaintiff followed-up with Estena Eldridge, N.P. on February 23, 2010. (R. at 275.) Plaintiff appeared pleasant, well-groomed, cheerful and cooperative. (R. at 275.) Ms. Eldridge noted that Plaintiff's medications were "effective." (R. at 275.) On March 22, 2010, Plaintiff attended a follow-up appointment during which she saw Nancy Wallace, F.N.P. (R. at 276.) Ms. Wallace noted that Plaintiff tolerated her

5

medications well and that Plaintiff was pleasant, cheerful, smiling and cooperative during her appointment. (R. at 276.) Ms. Wallace refilled Plaintiff's prescriptions and encouraged Plaintiff to stop drinking. (R. at 276.) On June 21, 2010, Dr. Lakhani indicated that Plaintiff tolerated her medication. (R. at 277.) Plaintiff reported that she was doing well and Dr. Lakhani noted that Plaintiff's affect, speech and thought were normal. (R. at 277.)

In September 2010, Ms. Wallace completed a mental status evaluation in which she noted that Plaintiff suffered from bipolar disorder. (R. at 280.) Plaintiff had been seeking treatment for the past nine months and had an overall good response. (R. at 280.) Plaintiff could tend to her activities of daily living and interests. (R. at 281.) Although Plaintiff was impulsive and short-tempered, Plaintiff's therapy better allowed her to avoid confrontation. (R. at 281.) Throughout therapy, Plaintiff was cooperative and talkative, lacked any confusion or memory problems, and demonstrated normal thought content. (R. at 282.) Ms. Wallace described Plaintiff's attention span, ability to perform calculation and abstract reasoning, judgment and fund of information as fair. (R. at 283.) Ms. Wallace opined that Plaintiff would experience deterioration of adaptive behaviors when under work stress, but that Plaintiff could manage her own funds. (R. at 283-84.) During Plaintiff's December 20, 2010 appointment, Ms. Wallace noted that Plaintiff appeared alert, oriented and talkative. (R. at 348.) Plaintiff noted that she was fully compliant with her medication and that her mood swings were no longer as bad. (R. at 348.)

On February 17, 2011, Plaintiff demonstrated normal speech and an euthymic mood. (R. at 349.) Plaintiff described her mood swings as well-controlled, but Plaintiff felt worried about her boyfriend's health problems. (R. at 349.) That day, Ms. Wallace and Dr. Lakhani wrote a

6

letter opining that Plaintiff could not sustain gainful employment due to her depression, anxiety, hypomania and impaired judgment stemming from her bipolar disorder. (R. at 346.) During Plaintiff's March 21, 2011 appointment, Ms. Wallace noted that Plaintiff was doing well. (R. at 351.) Plaintiff complained of mood swings, but appeared social and pleasant during the appointment. (R. at 351.) Plaintiff started attending 12-step meetings again and denied any drug use. (R. at 351.) Ms. Wallace refilled Plaintiff's prescriptions. (R. at 351.)

Plaintiff attended a follow-up appointment on September 20, 2011. (R. at 406.) Ms. Wallace noted that Plaintiff was diagnosed with tuberculosis while Plaintiff was incarcerated. (R. at 406.) Plaintiff attributed her arrest to the use of alcohol, which resulted in her fighting. (R. at 406.) During the appointment, Plaintiff reported that she was no longer drinking alcohol. (R. at 406.) Ms. Wallace indicated that Plaintiff tolerated her medicine well, had no difficulty sleeping and no problems with her appetite and mood. (R. at 406.)

On September 22, 2011, Ms. Wallace and Dr. Lakhani jointly completed a Mental Impairment Questionnaire. (R. at 410-12.) They indicated that they had treated Plaintiff since January 25, 2010, but noted that Plaintiff's treatment was interrupted by her incarceration in 2011. (R. at 410.) They opined that Plaintiff would have difficulty working a regular job, because her "distractibility and irritability impair her ability to be responsible to a job and not distract her co-workers." (R. at 411.) Plaintiff experienced moderate limitations in her activities of daily living and marked limitations in her ability to maintain social functioning and maintain concentration, persistence or pace. (R. at 412.) They noted that Plaintiff suffered one or two repeated episodes of extended decompensation. (R. at 412.)

7

C.    State Agency Psychologists' and Physician's Opinions

1.  State Agency Physician

On December 27, 2010, Martin Cader, M.D. completed a Disability Determination Explanation regarding Plaintiff's physical condition. (R. at 53-56.) Dr. Cader opined that Plaintiff experienced no physical impairments. (R. at 56.) On May 2, 2011, Josephine Cader, M.D. rendered a similar opinion, finding no evidence of Plaintiff being unable to perform her activities of daily living or basic work activities. (R. at 79.)

2.  State Agency Psychologist

On January 3, 2011, Leslie E. Montgomery, Ph.D. completed a Disability Determination Explanation regarding Plaintiff's mental impairments. (R. at 56-60.) Dr. Montgomery noted that Plaintiff experienced mental impairments in the form of affective disorder and substance addiction disorder. (R. at 56.) She opined that Plaintiff had no significant limitation in her ability to: (1) remember locations and work-like procedures, (2) understand and remember very short and simple instructions, (3) carry out very short and simple instructions, (4) maintain attention and concentration for extended periods, (5) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, (6) sustain an ordinary routine without special supervision, (7) work in coordination with or in proximity to others without being distracted by them, (8) make simple work-related decisions, (9) ask simple questions or request assistance, (10) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, (11) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, (12) be aware of normal hazards and take appropriate precautions, (13) travel in unfamiliar places or use public transportation, and (14) set

8

realistic goals and make plans independently of others. (R. at 58-59.) Dr. Montgomery

indicated that Plaintiff suffered moderate limitations in her ability to: (1) understand and

remember detailed instructions, (2) carry out detailed instructions, (3) complete a normal

workday and work week without interruptions from psychologically based symptoms and

perform at a consistent pace without an unreasonable number and length of rest periods, (4)

interact appropriately with the general public, (5) accept instructions and respond appropriately

to criticism from supervisors, and (6) respond appropriately in the work setting. (R. at 58-59.)

　　　Dr. Montgomery further opined that Plaintiff had mild restrictions on her activities of

daily living. (R. at 57.) Plaintiff had moderate difficulties maintaining social functioning and

concentration, persistence or pace. (R. at 57.) Plaintiff had no repeated extended episodes of

decompensation. (R. at 57.) In May 2011, Linda Dougherty, Ph.D. concurred with Dr.

Montgomery's opinion. (R. at 80-83.)

　　　D.　　Function Report

　　　On August 18, 2010, Plaintiff completed a Function Report. (R. 223-30.) Plaintiff

indicated that she lived in an apartment with a friend. (R. at 223.) She took medication for her

bipolar disorder and depression, and did so without reminders. (R. at 223, 225.) Plaintiff noted

that these conditions affected her ability to sleep. (R. at 224.) Plaintiff had no problem tending

to her personal care and needed no reminders to take care of herself. (R. at 224-25.)

　　　Plaintiff prepared meals on a weekly basis. (R. at 225.) She performed household

chores, including cleaning and laundering her clothing, and she needed no help or reminders to

do these things. (R. at 225.) Plaintiff went outside daily and would travel by walking, taking the

bus or riding in a car. (R. at 226.) She could go out alone, but could not drive. (R. at 226.)

9

Plaintiff shopped in stores for clothes and personal items. (R. at 226.) She could count change, but could not pay bills, handle a savings account or use a checkbook, because she did not have any money in the bank. (R. at 226.) Her ability to handle money had not changed since the onset of her condition. (R. at 227.)

Plaintiff's hobbies included watching television and playing cards, and she participated in these activities every day. (R. at 227.) She spent time with others every other day by talking and sitting on their porches. (R. at 227.) Plaintiff had no difficulty getting along with family, friends and neighbors, but her condition changed her attitude and caused her to experience anger and mood swings. (R. at 228.)

Plaintiff went to therapy and doctor appointments on a regular basis and she did not need reminders to make her appointments. (R. at 227.) She did not require anyone to accompany her to these appointments. (R. at 227.) Plaintiff's condition had no effect on her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs or use her hands. (R. at 228.) Her condition also did not affect her ability to talk, see, remember, complete tasks, concentrate, follow instructions and get along with others. (R. at 228.) Plaintiff experienced problems hearing and understanding, but could pay attention "for a while." (R. at 228.) She could only walk a short distance before needing to stop and rest for forty-five minutes. (R. at 228.) She could follow written instructions if she could understand them and she was "okay" at following spoken instructions. (R. at 228.)

Plaintiff indicated that she was "okay most of the time" getting along with authority figures. (R. at 229.) Plaintiff could handle stress if she took her medication and could handle

10

changes in her routine.  (R. at 229.)  Plaintiff noted that she would "go[ ] off" on people when she got mad.  (R. at 229.)

E.     Third Party Reports

On August 18, 2010, Plaintiff's friend and roommate, Merlin Williamson, completed a Third Party Function Report.  (R. at 202-12.)  Mr. Williamson knew Plaintiff for ten years and spent about three hours with her each day.  (R. at 202.)  He indicated that Plaintiff spent her days eating breakfast, taking her medication and attending all of her doctors' appointments.  (R. at 203.)  Plaintiff's condition affected Plaintiff's ability to work and to sleep.  (R. at 204.)

Plaintiff experienced no difficulty in tending to her personal care.  (R. at 204.)  She did not need reminders to take care of her personal needs or take her medicine.  (R. at 205.)  Plaintiff could prepare her own meals and she did so every other day.  (R. at 205.)  Plaintiff sometimes cleaned her house for roughly an hour at a time.  (R. at 205-06.)  Plaintiff went out every other day and travelled by walking or riding a bike.  (R. at 206.)  She could go out alone, but could not drive.  (R. at 206.)  Plaintiff shopped for clothes every once in a while.  (R. at 207.)

Mr. Williamson listed Plaintiff's hobbies as reading and watching television.  (R. at 207.)  Plaintiff socialized with other people roughly every other day by watching television with friends.  (R. at 208.)  She experienced some difficulty getting along with others, because she would get angry.  (R. at 208.)  Plaintiff regularly attended doctors' appointments and therapy sessions.  (R. at 208.)  Plaintiff's condition affected her ability to understand, kneel, hear, concentrate, talk, complete tasks and get along with others.  (R. at 208.)  Plaintiff could pay attention if no one distracted her and she could sometimes finish what she started.  (R. at 209.)  Plaintiff struggled to follow written instructions, but could follow spoken instructions.  (R. at

11

209.) She was "okay" at getting along with authority figures. (R. at 209.) Plaintiff could handle stress and changes in her routine if she took her medication. (R. at 210.) Mr. Williamson noted that Plaintiff "goes off" when someone makes her angry. (R. at 210.)

F.    Plaintiff's Testimony

On April 26, 2012, Plaintiff, represented by an attorney, testified at a hearing in front of an ALJ. (R. at 19-20.) Plaintiff stated that she completed school through the twelfth grade and attended special education classes. (R. at 27.) Plaintiff lived in an apartment with her friend. (R. at 25-26.) She could not drive, because she had a suspended license stemming from a DUI conviction. (R. at 26.) Plaintiff typically used the bus to get to her appointments and she took the bus to the hearing that day. (R. at 26-27.) She spent her days laying around, watching television and reading. (R. at 43-44.)

Plaintiff experienced back pain and foot pain that left her unable to work. (R. at 30.) She took Aleve, which stopped the pain. (R. at 31-32.) In addition to her back and foot pain, Plaintiff also sought treatment for her depression, anxiety, anger and bipolar disorder. (R. at 34.) She attended treatment at the Daily Planet about every three months. (R. at 34.) Plaintiff took Zoloft to treat her depression and Ambien for her sleep problems. (R. at 34-35.) Plaintiff had anger problems and difficulty getting along with others. (R. at 35-37.) She struggled to finish what she started, because she had difficulty concentrating. (R. at 37.)

Plaintiff went to jail in December 2009 for seven months due to a probation violation for using cocaine and marijuana. (R. at 40-41.) Plaintiff also went to jail in December 2010 for thirty days on public drunkenness charges. (R. at 39.) She was incarcerated again in June 2011 for sixty days on assault charges, stemming from an altercation that she had while drinking. (R.

at 39.)  Plaintiff was jailed overnight in December 2011 due to intoxication.  (R. at 45.)  Plaintiff

testified that she had not had any alcohol, since that incident.  (R. at 45.)

## II. PROCEDURAL HISTORY

In July 2010, Plaintiff filed applications for DIB and SSI due to an affective disorder and

a substance abuse disorder beginning July 1, 2009.  (R. at 9, 11.)  Plaintiff's claim was denied

initially on January 7, 2011, and again on reconsideration on May 5, 2011.  (R. at 9.)  Plaintiff

filed a written request for a hearing on May 11, 2011, and appeared with counsel before an ALJ

on April 26, 2012.  (R. at 9.)  On April 30, 2012, the ALJ denied claimant benefits.  (R. at 6.)  On

June 11, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's

decision the final decision of the Commissioner subject to judicial review by this Court.  (R. at 1-

4.)

## III. QUESTIONS PRESENTED

1. Did the ALJ err in assigning less than controlling weight to Plaintiff's treating medical sources' opinions?

2. Did the ALJ err in finding that Plaintiff maintained the ability to perform work at all exertional levels with nonexertional limitations?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to

determining whether the Commissioner's decision was supported by substantial evidence on the

record and whether the proper legal standards were applied in evaluating the evidence.  *Hancock*

*v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

Cir. 2005)).  Substantial evidence is more than a scintilla, less than a preponderance and is the

kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion.

*Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). The analysis is conducted for the Commissioner by the ALJ and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").[3]  20 C.F.R. §§ 416.920(b), 404.1520(b).  If a claimant's work constitutes SGA, the

analysis ends and the claimant must be found "not disabled," regardless of any medical

condition.  *Id.*  If the claimant establishes that she did not engage in SGA, the second step of the

analysis requires her to prove that he has "a severe impairment . . . or combination of

impairments which significantly limit[s] [his] physical or mental ability to do basic work

activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c).  To qualify as a severe

impairment that entitles one to benefits under the Act, it must cause more than a minimal effect

on one's ability to function.  20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment

listed in 20 C.F.R. part 404, subpart P, appendix 1 (listing of impairments) and lasts, or is

expected to last, for twelve months or result in death, it constitutes a qualifying impairment and

the analysis ends.  20 C.F.R. §§ 416.920(d), 404.1520(d).  If the impairment does not meet or

equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is

required to determine whether the claimant can return to her past relevant work[4] based on an

---

[3]      SGA is work that is both substantial and gainful as defined by the Agency in the
C.F.R.  Substantial work activity is "work activity that involves doing significant physical or
mental activities.  Your work may be substantial even if it is done on a part-time basis or if you
do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R.
§ 404.1572(a).  Gainful work activity is work activity done for "pay or profit, whether or not a
profit is realized." 20 C.F.R. § 404.1572(b).  Taking care of oneself, performing household tasks
or hobbies, therapy or school attendance, and the like, are not generally considered substantial
gainful activities.  20 C.F.R. § 404.1572(c).

[4]      Past relevant work is defined as SGA in the past fifteen years that lasted long
enough for an individual to learn the basic job functions involved.  20 C.F.R. §§ 416.965(a),
404.1565(a).

assessment of the claimant's Residual Functioning Capacity ("RFC")[5] and the "physical and

mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e),

404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden

of proof remains with the claimant through step four of the analysis, such that she must prove

that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146

n.5 (1987); *Hancock,* 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the

Commissioner at the fifth step to show that, considering the claimant's age, education, work

experience and RFC, the claimant is capable of performing other work that is available in

significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock,*

667 F.3d at 472-73; *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S.

at 146, n.5). The Commissioner can carry his burden in the final step with the testimony of a

Vocational Expert ("VE"). When a VE is called to testify, the ALJ's function is to pose

hypothetical questions that accurately represent the claimant's RFC based on all evidence on

record and a fair description of all of the claimant's impairments, so that the VE can offer

testimony about any jobs existing in the national economy that the claimant can perform. *Walker

v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of

---

5    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.,* 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful."

*Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be

disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

### A. The ALJ's Decision

Plaintiff, represented by counsel, appeared before the ALJ for a hearing on April 26,

2012. (R. at 9.) An impartial VE also appeared at the hearing. (R. at 9.) On April 30, 2012, the

ALJ issued a written opinion and determined that, based on the Plaintiff's July 2010 applications,

Plaintiff was not disabled under the Act. (R. at 9-18.)

The ALJ followed the five-step sequential evaluation process as established by the Act in

analyzing whether Plaintiff was disabled. (R. at 10-11.) First, the ALJ determined that Plaintiff

had last met the insured status requirement on June 30, 2010, and that Plaintiff had not engaged

in substantial gainful activity since July 1, 2009 — Plaintiff's alleged onset date. (R. at 11.) At

step two, the ALJ determined that Plaintiff suffered severe impairments in the form of an

affective disorder and a substance abuse disorder. (R. at 11.) At step three, the ALJ determined

that Plaintiff did not have an impairment or combination of impairments that met or equaled the

severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. at 12);

*see also* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

At step four, the ALJ determined that Plaintiff maintained the RCF to perform a full

range of work at all exertional levels with nonexertional limitations. (R. at 13.) Plaintiff was

limited to simple, routine and repetitive tasks, no fast-paced production, a static work

17

environment with only occasional interaction with co-workers and supervisors, and isolation from the general public. (R. at 13.)

In reaching this conclusion, the ALJ considered objective medical evidence and opinion evidence. (R. at 13.) The ALJ afforded Plaintiff's treating medical sources' opinions little weight, as Ms. Wallace's and Dr. Lakhani's opinions were inconsistent with medical records and treatment notes. (R. at 15-16.) Finally, at step five of the analysis, the ALJ concluded that Plaintiff could not perform her past relevant work as a housekeeper and laundry worker. (R. at 16.) However, based upon Plaintiff's age, education, work experience and RFC, jobs existed in the national economy in significant numbers that Plaintiff could perform. (R. at 16.)

Plaintiff moves for a finding that she is entitled to benefits on the basis that the ALJ erred in finding that she is capable of performing work at all exertional levels with nonexertional limitations. (Pl.'s Mem. at 1.) Plaintiff also contends that the ALJ erred in assigning less than controlling weight to Dr. Lakhani's and Ms. Wallace's opinions. (Pl.'s Reply at 1.) Defendant asserts that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Mem. in Supp. ("Def.'s Mem.") (ECF No. 14) at 10-17.)

> B. The ALJ did not err in affording Plaintiff's treating medical sources' opinions less than controlling weight.

Plaintiff essentially argues that the ALJ erred in affording little weight to the opinions of Plaintiff's treating medical sources. (Pl.'s Reply at 1.) Defendant contends that substantial evidence supports the ALJ's determination to afford little weight to Dr. Lakani's and Ms. Wallace's opinions. (Def.'s Mem. at 14-17.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e).

By finding an RFC that enabled Plaintiff to engage in work at all exertional levels with nonexertional limitations, the ALJ was forced to reconcile divergent opinions offered by Plaintiff's treating sources and those offered by state agency physicians. In doing so, the ALJ

afforded Dr. Lakhani's and Ms. Wallace's opinions little weight, because they were extreme and inconsistent with medical records and treatment notes. (R. at 15-16.) Here, Dr. Lakhani and Ms. Wallace from the Daily Planet opined that Plaintiff would have difficulty working a regular job on the basis that her "distractibility and irritability impair her ability to be responsible to a job and not distract her co-workers." (R. at 411.) Plaintiff experienced moderate limitations in her activities of daily living and marked limitations in her ability to maintain social functioning and maintain concentration, persistence or pace. (R. at 412.) They noted that Plaintiff suffered one or two repeated episodes of extended decompensation. (R. at 412.)

Substantial evidence supports the weight assigned to their opinions. During Plaintiff's January 25, 2010 appointment at Daily Planet, Plaintiff was cooperative and demonstrated normal speech and eye contact. (R. at 274.) On February 23, 2010, Plaintiff appeared pleasant, well-groomed, cheerful and cooperative, and the nurse reported that Plaintiff's medications were "effective." (R. at 275.) On June 21, 2010, Plaintiff reported that she was doing well, and Dr. Lakhani noted that Plaintiff's affect, speech and thought were normal. (R. at 277.) In September 2010, Ms. Wallace noted that Plaintiff had an overall good response to her treatment and Plaintiff could tend to her activities of daily living and interests. (R. at 280-81.) Ms. Wallace described Plaintiff's attention span, ability to perform calculation and abstract reasoning, judgment and fund of information as fair. (R. at 283.) During Plaintiff's December 20, 2010 appointment, Plaintiff reported that her mood swings were no longer as bad as before. (R. at 348.) On February 17, 2011, Plaintiff described her mood swings as well-controlled. (R. at 349.) During Plaintiff's March 21, 2011 appointment, Ms. Wallace noted that Plaintiff was

doing well and tolerated her medication well. (R. at 351.) Therefore, the ALJ did not err in affording little weight to Dr. Lakhani's and Ms. Wallace's opinions.

C. The ALJ did not err in determining that Plaintiff had the ability to perform work at all exertional levels with nonexertional limitations.

Plaintiff contends that the ALJ erred in finding that Plaintiff maintained the ability to perform work at all exertional levels with nonexertional limitations, because Plaintiff argues that she could not work. (Pl.'s Mem. at 1.) Defendant responds that substantial evidence supports the ALJ's RFC determination. (Def.'s Mem. at 10-13.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ will first assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in making his RFC determination; however, before a determination is made that a claimant is not disabled, the ALJ is responsible for developing the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

After considering all of Plaintiff's physical and mental impairments, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels with nonexertional limitations. (R. at 13.) Specifically, Plaintiff was limited to simple, routine and repetitive tasks,

no fast-paced production, a static work environment with only occasional interaction with co-workers and supervisors, and isolation from the general public.  (R. at 13.)

Substantial evidence supports the ALJ's determination.  Regarding Plaintiff's ability to perform work at all exertional levels, Dr. Martin Cader opined that Plaintiff experienced no physical impairments.  (R. at 56.)  Dr. Josephine Cader opined that no evidence existed to demonstrate that Plaintiffs could not perform her work activities or activities of daily living.  (R. at 79.)  Plaintiff herself indicated that her condition had no effect on her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs or use her hands.  (R. at 228.)  Further, Plaintiff prepared meals on a weekly basis and  performed household chores including cleaning and laundering her clothing.  (R. at 225.)  Also, though Plaintiff complained of foot and back pain, over-the-counter medicine (Aleve) stopped her pain.  (R. at 30-32.)  Thus, substantial evidence supports the ALJ's determination that Plaintiff could perform work at all exertional levels.

Further, substantial evidence supports the ALJ's determination regarding Plaintiff's nonexertional limitations.  Dr. Montgomery and Dr. Dougherty opined that Plaintiff had no significant limitations in her ability to:  (1) remember locations and work-like procedures, (2) understand and remember very short and simple instructions, (3) carry out very short and simple instructions, (4) maintain attention and concentration for extended periods, (5) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, (6) sustain an ordinary routine without special supervision, (7) work in coordination with or in proximity to others without being distracted by them, (8) make simple work-related decisions, (9) ask simple questions or request assistance, (10) get along with co-workers or peers, (11) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness,

22

(12) be aware of normal hazards and take appropriate precautions, (13) travel in unfamiliar places or use public transportation, and (14) set realistic goals and make plans independently of others. (R. at 58-59, 81-83.) They further opined that Plaintiff had mild restrictions on her activities of daily living. (R. at 57, 80.) Plaintiff had moderate difficulties maintaining social functioning and concentration, persistence or pace. (R. at 57, 80.)

Plaintiff herself reported that she needed no help or reminders to tend to her personal care or perform chores. (R. at 224-25.) She spent time with others by talking and sitting on their porch and had no difficulty getting along with family, friends and neighbors. (R. at 227-28.) Plaintiff's condition did not affect her ability to talk, see, remember, complete tasks, concentrate, follow instructions and get along with others. (R. at 228.) She was "okay most of the time" getting along with authority figures. (R. at 229.) She could handle stress if she took her medication and could handle changes in her routine. (R. at 229.)

Mr. Williamson indicated that Plaintiff socialized with other people roughly every other day by watching television with friends. (R. at 208.) She experienced some difficulty getting along with others because she would get angry, but was "okay" at getting along with authority figures. (R. at 208-09.) Plaintiff could pay attention if no one distracted her, and she could sometimes finish what she started. (R. at 209.) Plaintiff could handle stress and changes in her routine with medication. (R. at 210.) Therefore, the ALJ did not err in finding that Plaintiff maintained the ability to perform a full range of work at all exertional levels with nonexertional limitations.

23

## VI. CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne with notification to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: April 7, 2014

24